OPINION
{¶ 1} Appellant, Kurt Wayne Ross, appeals from the July 31, 2002 judgment entry of the Ashtabula County Court of Common Pleas, in which he was sentenced for rape and labeled as a sexual predator.
 {¶ 2} On August 1, 2001, appellant was indicted by the Ashtabula County Grand Jury on one count of rape, a felony of the first degree, in violation of R.C. 2907.02(A)(2). On August 3, 2001, appellant was arraigned and entered a plea of not guilty. A jury trial commenced on April 23, 2002. On April 25, 2002, the jury returned a verdict of guilty. A sexual predator evaluation was filed on May 28, 2002.
 {¶ 3} The facts at trial revealed the following: on March 7, 2000, at approximately 3:00 p.m., Victoria Sassmanshausen ("Victoria") was walking through the Chi Chi's parking lot on Route 20 near the Ashtabula Mall. Victoria testified that she encountered appellant, who asked her if she needed a ride, and she replied that she did not. Victoria said that appellant drove away but turned around and approached her again.
 {¶ 4} According to Victoria, appellant asked her how old she was. Victoria replied that she was nineteen. Victoria said that appellant asked her again if she wanted a ride so that they could get to know each other, and she agreed. After Victoria got into appellant's car, she stated that he drove east on Route 20. Victoria testified that appellant said that he worked at Picken's Plastics, and told her that his first name was Craig. However, Victoria could not remember what appellant told her that his surname was, but did remember that he said that it began with the letter "M."
 {¶ 5} According to Victoria, "[appellant] pulled into a few driveways, kept saying he was missing his turn. And [appellant] stopped at a house with a barn sitting next to it." Victoria testified that appellant got out of his vehicle, told her that he had to urinate, and went inside the barn. About ten minutes later, Victoria said that appellant returned to his car and stated to her that she had to come see the barn. Victoria complied.
 {¶ 6} While inside the barn, Victoria testified that "[appellant] told me to go up the stairs. * * * [Appellant] was right behind me going up the stairs. And [appellant] tried kissing my neck, and I pushed him away." Victoria stated that she told appellant that things should not be rushed and he said "okay." According to Victoria, they left the barn and continued to drive around the area.
 {¶ 7} Victoria testified that appellant drove past five or six roads, turned around because he "missed his turn," and proceeded up a muddy, grassy driveway to an old barn. According to Victoria, appellant lightly grabbed her by the arm, and told her to come with him inside the barn. Victoria complied. Victoria stated that "[w]e walked in and [appellant] closed the doors behind us. And [appellant] said that we were going to need privacy." Because she felt nervous, Victoria tried to walk over by the doors, but she stated that appellant grabbed her and told her that he wanted to kiss her. Victoria testified that she did not want to kiss appellant and backed away from him. Victoria said that appellant grabbed her, told her that he just wanted a kiss, and kissed her neck.
 {¶ 8} According to Victoria, appellant then grabbed her tank top, pulled it up, and pulled on her bra. Victoria told appellant to stop, and he called her a bitch. Victoria stated that appellant kept pulling on her clothes, was forcing himself on her, and would not stop. At that point, Victoria testified that appellant began kissing her breasts. Victoria tried pushing appellant away, and he told her that they would not have sex. Victoria stated that appellant pushed her on to a green recliner and tried to pull her pants off, but she squeezed her legs together and told him to stop.
 {¶ 9} Victoria testified that appellant managed to remove her shoes and jeans, however, stopped trying to remove her underwear, and just moved them off to the side and performed oral sex on her. Victoria stated that she was unable to get up from the recliner and tried pushing appellant away, but appellant put her hands behind her head. Victoria said that appellant then began to remove his pants, and she told him: "I thought you said you weren't. You said this wasn't going to happen. [Appellant] smiled at me and he said he lied." Victoria testified that appellant then inserted his penis, without a condom, into her vagina. Victoria stated that she was crying and that she told him to stop. Victoria said that she tried to get up but appellant placed his hand on her throat and held her down. Victoria testified that she was scared, did not move, and just laid there crying softly. Victoria indicated that "[appellant] looked up and he said, `I hate it when they do that.'" Victoria described appellant's behavior at that point as "[a]ngry, mad."
 {¶ 10} According to Victoria, appellant asked her to turn over but she refused. Victoria stated that appellant told her that he was almost done, pulled himself off of her, and stroked himself until he ejaculated on her stomach. Victoria said that appellant told her that "`[y]ou can't walk around with big tits like that and not expect something like this to happen.'" Victoria testified that appellant apologized to her, said that he was not himself, asked her if she was going to call the police, and wanted to know if she wanted money. Because Victoria was scared, she told appellant that she would not call the police. Victoria testified that appellant forced her to walk backwards out of the barn and told her not to turn around. They got into his car and appellant drove toward Ashtabula.
 {¶ 11} Victoria stated that appellant asked her where she wanted to go, and she told him "Chi Chi's." Victoria said that appellant asked her if she thought that he was a "psycho," but she did not respond. Victoria testified that appellant offered to go to the ATM and get her any amount of money that she wanted, but Victoria declined his offer. After realizing that appellant passed Chi Chi's, Victoria told him to take her to Subway, on Route 20, where she was previously employed. Victoria stated that appellant complied, apologized to her again, and asked her if she was going to call the police, to which she responded that she would not. Victoria entered Subway at approximately 5:00 p.m. and immediately advised Chris Rose ("Rose"), the manager/owner, to call 9-1-1.
 {¶ 12} Rose testified that Victoria was "very visibly upset." Rose said that Victoria told him that she had been raped, or words to that effect. Rose stated that he turned away from Victoria for a moment because he was busy, and then noticed that she was gone.
 {¶ 13} Victoria testified that she left Subway and ran to the nearby home of her mother's friend, Sue Shaffer ("Shaffer"), located at 3211 Court Street in Ashtabula. According to Shaffer, Victoria was crying, looked very scared, was shaking, and told her that she had been raped. At that time, Shaffer called Victoria's mother, Lori Willenbrecht ("Lori"). After Lori arrived, Shaffer called 9-1-1. Lori testified that Victoria was crying, visibly upset, and shaking, as well as told her that she was raped.
 {¶ 14} Deputy Mark Allen ("Deputy Allen"), a deputy with the Ashtabula County Sheriff's Office, was dispatched to Shaffer's home sometime after 5:00 p.m. Deputy Allen testified that Victoria was balled up crying on the couch when he first arrived. Deputy Allen prepared a written statement, in which Victoria initially told him that she was forced into appellant's vehicle and kidnapped. However, Deputy Allen stated that Victoria later told him that she got into appellant's car voluntarily. Deputy Allen recommended that Victoria go to the hospital, and Lori took her to the Ashtabula County Medical Center ("hospital").
 {¶ 15} At the hospital, the emergency room nurse, Jean Hermick ("Hermick"), stated that Victoria was "[s]ubdued and crying, tearful." Dr. Sonja Stiller ("Dr. Stiller") conducted a rape exam and testified that Victoria was "very tearful and very upset." Dr. Stiller noticed scratches on Victoria's left shoulder and stated that Victoria complained of neck pain. Dr. Stiller reported that there was no trauma to Victoria's vaginal area. However, Dr. Stiller stated that based on her experience, it is typical to find no vaginal trauma in rape victims.
 {¶ 16} Dale Laux, a forensic scientist with the Ohio Bureau of Criminal Identification, testified that DNA testing revealed the presence of semen and amylase in specimens collected during the rape exam of Victoria.
 {¶ 17} Victoria said that on March 8, 2000, she went with Detective Frye and Detective Hunt to find the second barn, which had been burned down. Justin Tuttle, an assistant chief of the Monroe Township Volunteer Fire Department, testified that his department engaged in a control burn of the barn at issue on the evening of March 7, 2000.
 {¶ 18} Detective Brian Hubbard ("Detective Hubbard"), a detective with the Ashtabula County Sheriff's Department, testified that through information provided by Victoria, he was able to determine appellant's identity. Detective Hubbard went to Picken's Plastics and eventually arrested appellant.
 {¶ 19} According to appellant, who was twenty-eight years old at the time of the incident at issue, he picked up Victoria in the Chi Chi's parking lot on March 7, 2000, and lied about his name to her because he had a girlfriend. At the first barn, appellant stated that he and Victoria kissed each other. At the second barn, appellant said that he and Victoria further kissed and that she fondled his privates. Appellant testified that at no time did Victoria object. After engaging in intercourse, appellant indicated that he told Victoria that there could be no further relationship between them because he had a girlfriend, and Victoria became very upset. Appellant explained that he used Victoria for sex.
 {¶ 20} A sentencing hearing commenced on July 29, 2002. At that hearing, Gerald Heinbaugh ("Heinbaugh"), Executive Director of the Forensic Psychiatric Center of Northeast Ohio ("FPCONO"), testified for the state. According to Heinbaugh, a sexual predator evaluation of appellant was conducted on May 15, 2002. Heinbaugh stated that appellant was given an Abel assessment that assesses whether a person has a sexual interest in a very young person, which proved inconclusive. Heinbaugh also performed an MMPI test on appellant and testified that appellant scored high on the psychopathic deviant scale, which showed characteristics of antisocial personality disorder. On the Static 99 test, Heinbaugh said that appellant fell in the high risk category of likely to re-offend, which consisted of a fifty-two percent chance of re-offending within fifteen years. Heinbaugh stated that he believed that the factors that applied pursuant to R.C.2950.09 were that appellant had a prior sex offense conviction, used force and cruelty at the time of the offense, and that there had been a pattern of antisocial behavior established.
 {¶ 21} Linda Blum ("Blum"), a social worker with the FPCONO, also testified for the state at the sentencing hearing. Blum stated that one of appellant's prior offenses, a 1999 public indecency charge, involved an incident where he masturbated in front of seven and eleven year old girls. Blum opined that based on appellant's tests, he is at a high risk to re-offend.
 {¶ 22} Pursuant to the July 31, 2002 judgment entry, the trial court sentenced appellant to a definite term of ten years and labeled him a sexual predator. It is from that judgment that appellant filed a timely notice of appeal and makes the following assignments of error:
 {¶ 23} "[1.] The [t]rial [c]ourt erred by sentencing [a]ppellant to the maximum sentence of ten years incarceration.
 {¶ 24} "[2.] The [t]rial [c]ourt [e]rred in [d]etermining [a]ppellant to be a [s]exual [p]redator pursuant to R.C. 2950.09.
 {¶ 25} "[3.] The conviction is against the manifest weight of the evidence."
 {¶ 26} In his first assignment of error, appellant argues that the trial court erred by sentencing him to the maximum sentence. Appellant contends that the trial court erred by taking into account Victoria's petite size and youthful appearance as well as by considering him to possess a propensity to commit crimes against minors. Also, appellant stresses that it was error for the trial court to find him highly likely to commit future offenses.
 {¶ 27} R.C. 2929.12(B)(2) provides that one of the factors to be considered in determining whether an offender's conduct is more serious than conduct normally constituting the offense is whether "[t]he victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense."
 {¶ 28} R.C. 2929.12(D) states that: "[t]he sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is likely to commit future crimes:
 {¶ 29} "(1) At the time of committing the offense, the offender was under release from confinement before trial or sentencing * * * or under post-release control * * * for an earlier offense * * *.
 {¶ 30} "(2) The offender * * * has a history of criminal convictions.
 {¶ 31} "(3) The offender has not * * * responded favorably to sanctions previously imposed for criminal convictions.
 {¶ 32} "(4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense * * *.
 {¶ 33} "(5) The offender shows no genuine remorse for the offense."
 {¶ 34} In order to sentence a defendant to the maximum term of incarceration, a trial court must make certain findings pursuant to R.C. 2929.14(C). State v. Edmonson (1999),86 Ohio St.3d 324, 328. Specifically, "the record must reflect that the trial court imposed the maximum sentence based on the offender satisfying one of the listed criteria in R.C. 2929.14(C)." Id. at 329. Those specified criteria include: (1) the offender committed the worst form of the offense; (2) the offender poses the greatest likelihood of committing future crimes; (3) the offender is a major drug dealer; and (4) the offender is a repeat violent offender. R.C. 2929.14(C).
 {¶ 35} The Supreme Court in State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 26, stated that the trial court must make a similar pronouncement at the sentencing hearing regarding the imposition of a nonminimum sentence on a first offender. Thus, there is a cogent basis to conclude that the same rationale applies to the imposition of a nonminimum sentence involving a defendant who has previously served a prison term. R.C.2929.14(B)(1). Hence, the trial court must also make the required findings at such defendant's sentencing hearing.
 {¶ 36} Additionally, when the sentencing court wishes to impose the maximum sentence on a defendant, it must give its reasons pursuant to R.C. 2929.19(B)(2)(d). State v. Jones, 11th Dist. No. 2001-L-176, 2003-Ohio-476, at ¶ 15. This court has held that: "[a] sentence which merely recites the language of R.C.2929.14(C) without any consideration of the statutorily relevant factors is insufficient. * * * For meaningful review, the record must contain some indication, by use of specific operative facts, that the sentencing court considered the statutory factors in reaching its determination. * * *." State v. Perry (Mar. 29, 2002), 11th Dist. No. 2000-L-166, 2002 Ohio App. LEXIS 1496, at 6-7, citing State v. Kase (Sept. 25, 1998), 11th Dist. No. 97-A-0083, 1998 Ohio App. LEXIS 4498, at 2.
 {¶ 37} In the case at bar, the trial court stated at the sentencing hearing that:
 {¶ 38} "Concerning the sentence in this case, the [c]ourt has considered all of the sentencing factors. First of all, finds that [Victoria] suffered * * * serious psychological harm. And the fact that as far as recidivism being more likely, [appellant] has a history of criminal convictions and delinquency adjudications, and further has not responded favorably to the sanctions previously imposed.
 {¶ 39} "Concerning the duration of the term, * * * the shortest term * * * would not be appropriate since the defendant had previously served a prison sentence * * *. And further, the shortest term would demean the seriousness of the offense and does not adequately protect the public.
 {¶ 40} "The [c]ourt may consider the longest term only if one of the following factors is determined. First of all, that [appellant] committed the worst form of the offense. * * * However, I cannot say in having to evaluate these matters that [appellant] committed the worst form of the offense of [r]ape as a first degree felony."
 {¶ 41} "The second factor to consider is [appellant] possesses the greatest likelihood of committing future crimes. I believe that the evaluation that was done by [Heinbaugh] and also including the reports from Stanley Palumbo, Ph.D., indicated that there was a great likelihood of future crimes being committed. And in this instance, I believe that the maximum [sentence] of ten years is warranted."
 {¶ 42} The trial court also made reference at the sentencing hearing with respect to the fact that Victoria is very youthful looking, and that the other female victims in these other offenses were young girls.
 {¶ 43} In this case, the sentencing judge, who was also the trial judge, made reference at the sentencing hearing and in its July 31, 2002 judgment entry that he considered the record, oral statements, and the presentence report. The trial court did not find that appellant's acts constituted the worst form of the offense. However, the trial court determined that Victoria suffered serious psychological harm as well as that appellant was on probation at the time of the offense, has a history of criminal convictions and delinquency adjudications, has been previously incarcerated, and has not responded favorably to prior sanctions, which all support the great likelihood of appellant committing future crimes.
 {¶ 44} Pursuant to the foregoing, the trial court expressly imposed the maximum sentence based upon the great likelihood of appellant committing future crimes. Therefore, the trial court complied with the statutory requirements of R.C. 2929.12, R.C.2929.14(B) and (C), and R.C. 2929.19(B)(2)(d) in sentencing appellant to the maximum sentence. Thus, appellant's first assignment of error is without merit.
 {¶ 45} In his second assignment of error, appellant alleges that the trial court erred in determining him to be a sexual predator pursuant to R.C. 2950.09. Appellant submits that the testimony describing the act by Victoria does not give rise to the cruelty necessary to sustain a finding of a sexual predator. Appellant stresses that he had approximately a 50/50 possibility of engaging in recidivism in the next fifteen years. Also, appellant contends that his prior offenses involving minors were crimes of opportunity since the minors just happened to be present as victims. As such, appellant argues that there was insufficient evidence to convince the trial court by clear and convincing evidence that he is a sexual predator.
 {¶ 46} The applicable standard of review, under R.C.2950.01(E)(1), defines a sexual predator as "[a] person [who] has been convicted of or pleaded guilty to committing a sexually oriented offense * * * and is likely to engage in the future in one or more sexually oriented offenses."
 {¶ 47} In making a determination as to whether an offender is a sexual predator, the trial court must look to and consider all relevant factors pursuant to R.C. 2950.09(B)(3). The statutory criteria are intended to aid the trial court, which must determine by clear and convincing evidence, whether an offender is likely to commit one or more sexually oriented offenses in the future. Clear and convincing evidence is more than a mere preponderance of the evidence, yet does not rise to the level of evidence beyond a reasonable doubt. Cross v. Ledford (1954),161 Ohio St. 469, 477. Clear and convincing evidence is evidence which "`produces in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" Statev. Campbell (2000), 11th Dist. No. 99-L-012, 2000 Ohio App. LEXIS 6092, at 7, quoting Cross, supra, at paragraph three of the syllabus. Thus, "* * * a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
 {¶ 48} The Supreme Court of Ohio has indicated that appellate courts use a manifest weight standard to review a trial court's finding that an offender is a sexual predator. State v. Cook
(1998), 83 Ohio St.3d 404, 426. Thus, if the trial court's finding that an offender is a sexual predator is supported by the weight of the evidence, then the court must also have had sufficient evidence before it to satisfy the requisite clear and convincing degree of proof. Therefore, when reviewing questions of weight, an appellate court must determine whether the state appropriately carried its burden of persuasion by engaging in a limited weighing of the evidence. State v. Davis (Dec. 31, 1998), 11th Dist. No. 97-L-246, 1998 Ohio App. LEXIS 6389, at 34.
 {¶ 49} In the instant matter, because appellant was convicted of a sexually oriented offense, the first prong of R.C.2950.01(E)(1) has been met. Therefore, this court must determine the second prong of R.C. 2950.01(E)(1), namely, whether appellant is likely to engage in the future in one or more sexually oriented offenses.
 {¶ 50} The trial court relied upon numerous factors under R.C. 2950.09(B)(3) in supporting its finding that appellant is a sexual predator. In particular, the trial court found that pursuant to R.C. 2950.09(B)(3)(b), appellant has an extensive criminal record, which included three prior sex offenses. The trial court stated, according to R.C. 2950.09(B)(3)(c), that the age of the victim, Victoria, was nineteen years old at the time of this offense. Based on R.C. 2950.09(B)(3)(h), the trial court referenced that appellant has demonstrated a pattern of sexually oriented offenses with young females, and the victim in this case was a very young looking nineteen year old, five feet tall, one hundred and three pound female. Pursuant to R.C.2950.09(B)(3)(i), the trial court determined that appellant displayed cruelty during the commission of this offense by grabbing Victoria around the neck, forcefully removing her clothing, and physically forcing himself on her. Also, based on R.C. 2950.09(B)(3)(j), the trial court considered appellant's violent nature and antisocial behavior with respect to some of his previous offenses, which included robbing an eighty-four year old woman in her home at knife point. In addition, appellant's score on the Static 99 test fell in the high risk category of likely to re-offend. Thus, considering the factors pursuant to R.C. 2950.09(B)(3), the trial court was presented with clear and convincing evidence that appellant is likely to re-offend sexually in the future and properly labeled appellant as a sexual predator. Therefore, appellant's second assignment of error is without merit.
 {¶ 51} In his third assignment of error, appellant contends that his conviction is against the manifest weight of the evidence. Appellant stresses that when reviewing the entire evidence, including the credibility of the witnesses and Victoria's propensity for making false statements involving crimes as well as the fact that Victoria had been cheated on by a previous boyfriend and was emotionally upset after being used sexually by appellant, the trier of fact clearly lost its way in convicting him of rape.
 {¶ 52} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13-15:
 {¶ 53} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 54} "* * * `[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 55} "`In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)"' (Citations omitted.) * * *" (Emphasis sic.)
 {¶ 56} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 57} In the case sub judice, Victoria testified that appellant approached her in the Chi Chi's parking lot not once, but twice. After appellant asked Victoria her age and whether she wanted a ride, Victoria told him that she was nineteen and got into his vehicle. Victoria said, and appellant admitted, that he lied to her about his name and took her to two remote, isolated locations. Inside the first barn, Victoria indicated that appellant tried kissing her neck, she pushed him away, told him not to rush things, and they left. Inside the second barn, although Victoria told appellant numerous times to stop, she stated that he grabbed her, pulled off her clothes, forced himself upon her, performed oral sex on her, and inserted his penis into her vagina. According to Victoria, she tried to get up but appellant placed his hand on her throat and held her down. Victoria testified that appellant then stroked himself until he ejaculated on her stomach. Victoria said that appellant apologized to her, told her to walk backwards out of the barn, offered her money, and then drove her to Subway.
 {¶ 58} The jury then heard the testimony of Rose, the manager/owner of Subway. Rose stated that Victoria was crying, very emotional, and shaking. Rose said that Victoria told him to call 9-1-1 because she had been raped, or words to that effect. Victoria testified that she left Subway and ran to Shaffer's house. According to both Shaffer and Victoria's mother, Lori, Victoria was crying, looked very scared, was shaking, and told them that she had been raped. After Shaffer called 9-1-1, Deputy Allen arrived at her house and testified that Victoria was balled up crying on the living room couch. Although Deputy Allen stated that Victoria initially told him that she was forced into appellant's car and kidnapped, she later said that she got into his car voluntarily and was raped.
 {¶ 59} Furthermore, the emergency room nurse, Hermick, testified that Victoria was subdued and crying. Dr. Stiller stated that Victoria was crying and very upset. According to Dr. Stiller, Victoria had scratches on her left shoulder and said that Victoria complained of neck pain. Although there was no trauma to Victoria's vaginal area, Dr. Stiller testified that it is typical to find no vaginal trauma in rape victims. Therefore, based on the evidence presented, it was reasonable for the jury to conclude that Victoria had been raped by appellant. Thus, based on Schlee and Thompkins, supra, the jury did not clearly lose its way in convicting appellant. Appellant's third assignment of error is without merit.
 {¶ 60} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Ashtabula County Court of Common Pleas is affirmed.
Judgment affirmed.
Grendell and Rice, JJ., concur.